IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | 8:11CR312 |
| Plaintiff,   ) | |
| ) | |
| vs.   ) | FINDINGS AND |
| ) | |
| TERESA REILLY,   ) | RECOMMENDATION |
| ) | |
| Defendant.   ) | |

This matter is before the court on the motion to suppress statements filed by defendant Teresa Reilly (Reilly) (Filing No. 42). Reilly is charged in the Indictment with misprison of a felony, i.e., a conspiracy to manufacture marijuana, in violation of Title 18, United States Code, Section 4.

Reilly seeks to suppress any statements she made to law enforcement officers following her arrest on August 24, 2011. The court held a hearing on the motion on February 14, 2012. Reilly was present for the hearing along with her counsel, Assistant Federal Public Defender Richard H. McWilliams. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. The court heard the testimony of Sergeant John Olsen (Sergeant Olsen) and Investigator Jason Scott (Investigator Scott) of the Nebraska State Patrol (NSP). The court received into evidence a DVD of a patrol car video (Exhibit 1) and a copy of an affidavit in support of a search warrant for the premises at 12319 Grey Fawn Parkway in Omaha, Nebraska (Exhibit 2). A transcript (TR.) of the hearing was filed on February 20, 2012 (Filing No. 53), at which time the motion was deemed submitted.

## FINDINGS OF FACT

On August 24, 2011, at approximately 4:00 p.m., Sergeant Olsen accompanied a team of law enforcement officers executing a search warrant at a residence located at 12319 Grey Fawn Parkway in Omaha, Nebraska (TR. 7-8). Prior to the execution of the search warrant at the 12319 Grey Fawn Parkway residence, law enforcement officers participating in the search warrant met at the NSP Troop A office in Omaha for a briefing at 1:00 p.m. on August 24 (TR.12). The briefing covered the various residences that would

be searched along with persons of interest in the case (TR. 12). Sergeant Olsen recalled that Reilly was described as the girlfriend of the main suspect, that she lived at the Grey Fawn Parkway residence, and that she drove a silver Kia automobile with Nebraska license plates (TR. 12).

Sergeant Olsen's assignment was to provide security for the search team at the Grey Fawn Parkway residence after the search team completed their initial clearance of the residence (TR. 9). Sergeant Olsen was in uniform and in a marked NSP cruiser (TR. 8). After the search team made its initial entry, Sergeant Olsen backed his cruiser into the driveway of the residence with the front of his cruiser facing Grey Fawn Parkway (TR. 9-10). Sergeant Olsen's cruiser was equipped with a video/audio recording system (TR. 18; Exhibit 1). Sergeant Olsen was requested by Sergeant Meola, who was the investigative service sergeant on the case, to watch for anyone approaching the residence and, in particular, to look out for Reilly who may come by the residence (TR. 11). Sergeant Meola informed Sergeant Olsen that three of the four suspects were now in custody and that Reilly was still at large (TR. 11).

Approximately forty-five minutes after the search warrant team entered the Grey Fawn Parkway residence, Sergeant Olsen observed a silver Kia approaching from the right on Grey Fawn Parkway and appear to slow down while the driver, a white female with brunette hair looking similar to the photo of Reilly shown in the pre-search briefing, looked in Sergeant Olsen's direction (TR. 13-14). The Kia drove past the residence and continued westbound on Grey Fawn Parkway (TR. 14). Sergeant Olsen pulled out of the driveway, got behind the Kia, turned on the cruiser's lights, and stopped the Kia about three-quarters of a block away (TR. 14-15). The Kia stopped without incident (TR. 15).

Sergeant Olsen walked to the driver's side of the Kia and asked the driver her name (TR. 16). The driver responded "Justine Reilly" (TR. 16). Sergeant Olsen asked to see her driver's license and observed it was issued in the name of Teresa Reilly (TR. 16). When asked about the discrepancy, Reilly stated she goes by her middle name (TR. 16). When asked why she did not stop at the residence, Reilly stated she did not know what was going on (TR. 16). Sergeant Olsen asked Reilly to step out of the Kia and accompany him to the cruiser as he had to figure out what was going on and he had to contact the investigators (TR. 16). Reilly accompanied Sergeant Olsen to the cruiser and sat in the front passenger

seat (TR. 16; Exhibit 1). When asked if she knew why the police were at her house, Reilly replied, "No" (TR. 23; Exhibit 1). Sergeant Olsen telephoned Sergeant Meola, advised him he had someone in the car (Code 10-12) and asked if Reilly was to be arrested (Code 10-15) (TR. 24; Exhibit 1). Sergeant Olsen was directed to bring Reilly back to the residence to talk with one of the investigators at the residence (TR. 25; Exhibit 1). Sergeant Olsen drove Reilly to the residence (TR. 30; Exhibit 1).

When Sergeant Olsen and Reilly arrived at the residence, Investigator Scott met them and placed Reilly under arrest for manufacturing and distributing marijuana (Exhibit 1). Reilly was handcuffed by Sergeant Olsen and later transported to the NSP Troop A office where she was interrogated (TR. 27).

At the time of Reilly's arrest, Investigator Scott was aware of the incidents set forth in the Affidavit and Application For the Issuance of a Search Warrant for the residence at 12319 Grey Fawn Parkway (Exhibit 2). The Grey Fawn Parkway residence was one of four locations, three residences and a storage locker, being searched pursuant to a search warrant (TR. 32). While inside the Grey Fawn Parkway residence and prior to Reilly's arrest, Investigator Scott observed in plain sight numerous items that were consistent with the manufacture and distribution of marijuana including pre-harvested marijuana packaged for sale (TR. 35). Also observed in plain sight were ballasts, growing lights, power inverters, fertilizers, timers, currency counters, bongs, and currency (TR. 36). Prior to the execution of the Grey Fawn Parkway search warrant, Investigator Scott participated in the search of 26325 Douglas Street in western Douglas County where Reilly's co-defendants, Brasch, Burbach, and Wilkinson were found sitting on buckets trimming marijuana plants for packaging (TR. 38). Approximately 1100 marijuana plants along with grow lamps, fertilizers, power inverters, and other paraphernalia were seized at that location (TR. 38). At another search warrant location, 20860 Dutch Hall Road in Washington County, 400-500 marijuana plants were seized along with ballasts, grow lights, fertilizers, timers, pots, and other grow operation paraphernalia (TR. 38-39). Neither the western Douglas County nor Washington County locations had indicia of any person living there except for the marijuana grow operations (TR. 39). Prior to the search of the Grey Fawn Parkway residence, Investigator Scott participated in several controlled purchases of marijuana from Brasch at the Grey Fawn Parkway residence where Reilly was present for the transactions (TR. 41).

Reilly was Brasch's girlfriend, she lived at the Grey Fawn Parkway residence, and had her driver's license issued to her for that address (TR. 41). During the search of the Grey Fawn Parkway residence, one of the bedrooms contained women's clothing and drug use paraphernalia (TR. 42-43). Investigator Scott testified he could smell the odor of raw and smoked marijuana upon entry into the Grey Fawn Parkway residence (TR. 62).

## CONCLUSIONS OF LAW

Reilly seeks to suppress any statements she made to law enforcement officers following her arrest on August 24, 2011, as being the fruit of an unlawful arrest. Reilly argues she was placed under arrest at the time of the initial traffic stop. The government contends Reilly was not arrested until she was taken to the Grey Fawn Parkway residence and that her arrest at that time was legally justified.

Generally,"[d]etermining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (**quoting** *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The government has the burden to prove justification existed for any restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004).

One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Saenz*, 474 F.3d at 1136

4

(**citing** *Terry*, 392 U.S. at 30). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'" *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)).

"In making reasonable-suspicion determinations, reviewing courts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (internal quotation and citation omitted). "Reasonable suspicion must be supported by 'specific and articulable facts.'" *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (**citing** *Terry*, 392 U.S. at 21). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality." *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001); **see** *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008). The Supreme Court held

> "[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Indeed, *Terry* itself involved "a series of acts, each of them perhaps innocent" if viewed separately, "but which taken together warranted further investigation." [Further] . . . "innocent behavior will frequently provide the basis for a showing of probable cause," and . . . "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." That principle applies equally well to the reasonable suspicion inquiry.

*United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (internal citations omitted).

These concepts have been applied to individuals associated with the execution of a search warrant.

> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.

*Michigan v. Summers*, 452 U.S. 692, 704-05 (1981).

Similarly, "[o]fficers may lawfully detain the occupant of a house near that house while the premises are being searched pursuant to a valid search warrant." *United States v. Sturgis*, 652 F.3d 842, 844 (8th Cir. 2011) (**quoting** *United States v. Roberson*, 439 F.3d 934, 940 (8th Cir. 2006) (noting search warrant justified detention where before officers executed search warrant for a house they found suspect who was known occupant of house sitting in vehicle nearby)); **see also** *United States v. Bohannon*, 225 F.3d 615, 616–18 (6th Cir. 2000) (upholding pre-arrest detention of people arriving at a house subjected to the execution of a search warrant). The rationale supporting this rule is based upon the intrusiveness caused to the detainee, as well as the officers' interest in orderly completing the search and avoiding a risk of flight or harm to the officers. **See** *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994) (noting existence of search warrant did not justify detention of suspect who exited premises and had no knowledge of search warrant until he was arrested three to five miles away); *United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir. 1994) (noting existence of search warrant did not justify detention of suspect who exited premises and had no knowledge of search warrant until officers stopped him one block away).

In this case, Sergeant Olsen had reasonable suspicion to stop and briefly detain Reilly. Sergeant Olsen reasonably believed Reilly lived at the residence that was subject to the search being conducted by officers at that time. A search warrant authorized the search. The search of the residence followed the discovery of significant marijuana grow operations at locations associated with the residence. Although no evidence was presented during the hearing that linked Reilly to the other locations, she was linked to another individual living at the residence, the residence was linked to the other locations, and Reilly was present for several marijuana sales at the Grey Fawn Parkway residence. Sergeant Olsen had a physical description of Reilly and her automobile. He testified that he saw a woman driving an automobile, both meeting the descriptions given, slow down in

front of the residence, look at him, and proceed away from the residence. Under the circumstances, Sergeant Olsen had reasonable suspicion to stop and detain Reilly based on her relationship to the residence being searched by officers and the overall drug investigation.

Reilly argues the rule from *Summers* is not applicable to the case at bar and instead contends *United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) should control. In *Summers*, the Court provided three legitimate law enforcement interests that allowed police to detain residents of a home being searched for contraband: (1) preventing flight; (2) minimizing the risk of harm to the officers; and (3) the orderly completion of the search. *Summers*, 452 U.S. at 701-03. The *Reinholz* court found none of those law enforcement interests are applicable when the individual resident is away from the residence and unaware of the warrant. *Reinholz*, 245 F.3d 778; **see** *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994) (noting "agents could hardly claim an interest in orderly completing the search with Hogan's aid in view of the fact that they kept him handcuffed and outside the house during the entire search"). Accordingly, an individual's arrest cannot be justified under *Summers* as a legitimate detention of an occupant of the premises to be searched when the individual is away from the residence and unaware of the warrant. **See** *Reinholz*, 245 F.3d 778.

Reilly was not in or near the residence at the time the officers began the search. However, unlike the defendant in *Reinholz*, Reilly became aware of a police presence at the residence when she approached the residence in her automobile. Although Reilly was stopped by law enforcement three-quarters of a city-block from her home, she had already seen the officers and a police vehicle in the driveway. At that time, Reilly's detention was justified based on the officers' interests in (1) preventing flight; (2) minimizing the risk of harm to the officers; (3) conducting an orderly search; and (4) the continuation of the overall drug investigation. Accordingly, Reilly's motion to suppress statements based on an unlawful arrest should be denied with regard to any statements Reilly made to Sergeant Olsen between the time of the initial traffic stop and her formal arrest.

Reilly was formally arrested and placed in handcuffs by Sergeant Olsen at the residence. Sergeant Olsen had probable cause to believe that "at the time of the arrest, the available facts and circumstances [were] sufficient to warrant a person of reasonable

caution to believe that an offense was being or had been committed by the person to be arrested." *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (internal quotation and citation omitted). The residence was linked to a significant marijuana grow operation at other locations but involving residents of the Grey Fawn Parkway residence. The officers found marijuana and drug paraphernalia in nearly all areas of the Grey Fawn Parkway residence. The smell of burnt and raw marijuana permeated the house. The officers reasonably believed Reilly lived at the residence based on information conveyed during the pre-search briefing, Reilly's driver's license, and the existence of women's clothing found in one of the bedrooms. The officers observed drug paraphernalia in plain view in the same bedroom. Reilly had been present for several marijuana sales at the Grey Fawn Parkway residence. The circumstances supplied the officers with probable cause to arrest Reilly. Accordingly, Reilly's motion to suppress statements based on an unlawful arrest should be denied with regard to any statements Reilly made to officers. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that:**

Teresa Reilly's motion to suppress statements (Filing No. 42) be denied.

### ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 12th day of March, 2012.

BY THE COURT:
 s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.